# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GERALD HEIMSOTH,         )
         Plaintiff,    )
         )    No. 06 CV 7041
v.         )    Judge Blanche M. Manning
         )
ISIS M. GHOBRIAL,         )
         Defendant.    )

## MEMORANDUM AND ORDER

Defendant Isis Ghobrial was a long-time employee of Ciorba Group, Inc. when she resigned on January 21, 2005. Upon her resignation, she was entitled to the cash value of Ciorba shares held in the Employee Stock Ownership Plan maintained for her benefit. Ciorba paid her more than $90,000 for her shares, but the parties dispute whether that was the correct amount. Ciorba contends that it inadvertently overpaid Ghobrial, and the trustee of the ESOP, Gerald Heimsoth, sued to get back approximately $20,000. Ghobrial disputes Ciorba's valuation and asserts that she was actually underpaid by about $88,000. She has also filed a counterclaim against Heimsoth and Ciorba in which she alleges that (1) she was denied her right to make pre-retirement diversification distribution elections and, (2) Heimsoth violated his fiduciary duties as trustee.

The parties have filed cross-motions for summary judgment on all counts. For the reasons stated below, Heimsoth and Ciorba's motion for summary judgment [143-1] is granted, while Ghobrial's motion for summary judgment [140-1] is denied.

## BACKGROUND

The following facts are undisputed, except where noted. Ciorba Group, Inc. is a group of engineering consultants. It is not a publicly-traded company, but makes shares of the company available to its employees through its Employee Stock Ownership Plan ("ESOP"), a pension plan governed by the Employee Retirement Income Security Act of 1974, *see* 29 U.S.C. §§ 1104(a)(2), 1107(b), (d)(6). Over time, the ESOP allocates shares of the pool of Ciorba stock that it owns into employees' ESOP accounts. When vested employees leave the company, the shares that had been allocated to their account are returned to the pool of shares owned by the ESOP and the employee receives a distribution of the value of the shares. During Ghobrial's years with Ciorba, she had been allocated 28,250 shares of Ciorba stock in her ESOP account, and sought to obtain the value of those shares upon her resignation on January 21, 2005.

Under the 1997 Plan document (the one in effect when Ghobrial resigned), Ghobrial was entitled to compensation for the Ciorba shares allocated to her ESOP account based upon their value on December 31, 2004. Because Ciorba was not publicly-traded, the 1997 Plan required

that the value of the shares be determined by an independent appraiser. However, the 2004 valuation had not been completed before Ghobrial's resignation on January 21, 2005. Rather than forcing her to wait, in February 2005 the ESOP distributed to her $90,287.11, representing 70% of the value of her shares based upon their value on December 31, 2003, the most recent valuation. The distribution was subject to adjustment upon the completion of the December 31, 2004, valuation.

The December 31, 2004, valuation was completed on October 31, 2005, and reported a significant drop in the value of Ciorba shares. Heimsoth contends that, as a result, the value of Ghobrial's shares was only $70,980.39, $19,306.72 less than what the ESOP had previously distributed to her. Heimsoth notified Ghobrial in writing that she must return the overpayment, but she never did. So Heimsoth filed suit to recover the $19,306.72.

Ghobrial contends that the 2004 valuation was flawed and that, according to a report prepared by an accountant she hired, her shares should have been valued at $150,017. Accordingly, she asserts that she is under no obligation to return any of the distribution she received. She also asserts in her Second Amended Counterclaim that Heimsoth and Ciorba owe her damages based upon the following allegations: (1) she was denied the right to diversify a percentage of the Ciorba shares in her account during the period of time preceding her resignation, and (2) Heimsoth breached his fiduciary duties by orchestrating a change in the composition of Ciobra's board of directors to ensure that he could never be removed as trustee of the ESOP.

Each party has filed a motion for summary judgment, asking that judgment be entered in that party's favor on the single count of unjust enrichment under ERISA alleged in Heimsoth's complaint, as well as Ghobrial's claims of denial of the right to diversify and breach of fiduciary duty alleged in the Second Amended Counterclaim.

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c). The court construes all of the facts and the reasonable inferences drawn from those facts in favor of the nonmovant. *See Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). The nonmovant, however, may not merely rest upon the allegations or details in their pleadings, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322.

## ANALYSIS

### I.      Unjust Enrichment  (Count I of Complaint)

In this count, Heimsoth alleges that Ghobrial has been unjustly enriched by retaining an overpayment of the value of her ESOP holdings.  Ghobrial contends that she is entitled to summary judgment on this claim because the higher valuation performed by the accountant she hired, Howard Gamer, is more accurate than the lower valuation performed by the ESOP's long-time appraiser, John Maher.

To determine whether Heimsoth properly relied upon the valuation performed by Maher, the court must first look to the terms of the Plan.  Under the Plan, valuations "must be made in good faith and based on all relevant factors for determining the fair market value of securities." 1997 Plan ¶ 6.2.  The Plan addresses when a valuation has been made in good faith:

> [A] determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to the transaction will be deemed to be a good faith determination of value.  Company Stock not readily tradeable on an established securities market shall be valued by an independent appraiser meeting requirements similar to the requirements of the Regulations prescribed under Code Section 170(a)(1).

1997 Plan (Joint Exhibit 2 [154]) at ¶ 6.2.  The referenced regulation, in turn, establishes that, in pertinent part, appraisers are independent (the regulation uses the word "qualified') if they:

> (a)      hold themselves out to the public as an appraiser or perform appraisals regularly;

> (b)      are qualified to make appraisals of the type of property being valued; and

> (c)      do not own and have not been involved in buying or selling an interest in the property being appraised.

*See* 26 C.F.R. § 1.170A-13(c)(5).  Thus, under the terms of the Plan, Heimsoth was entitled to rely on Maher's valuation as long as the valuation was made in good faith.

The evidence in the record establishes that Maher's valuation was made in good faith. Within the 2004 valuation itself, Maher sets out his education and experience, establishing that he holds himself out as an appraiser, performs appraisals regularly, and is qualified to do so. 2004 Valuation (Joint Exhibit 27 [154]) at 73.  Although Ghobrial denies that Maher performs valuations or is qualified to perform them, she does so only conclusorily and without citations to the record (except to cite her own conclusory denials of Heimsoth and Ciorba's statements of facts, *see, e.g.,* Response to Statements of Facts [153] ¶ 4).  Additionally, the court has been

presented no evidence that Maher owned any of the property appraised or played any role in buying or selling the property.

Alternatively, Ghobrial asserts that Heimsoth was not entitled to rely on Maher's 2004 Valuation because the valuation was "worthless" for the following reasons: (1) Maher merely plugged numbers into his calculation in order to arrive at the predetermined valuation, and (2) his calculations were erroneous, i.e., he failed to include an acquisition premium and failed to account for revenues and expenses of third-party subcontractors.

Ghobrial's assertion that Maher "assigned arbitrary numbers into the formula to obtain the Ciorba value sought" is not supported by the record. Ghobrial Brief [157] at 2. The assertion relies upon the following exchange during Maher's deposition:

> Q:     Did you look at the results—in deciding to weight it 1,1,1,1,1, did you look at the results it would have on the ultimate evaluation when you did your weighing?
>
> A:     Yes.
> . . .
>
> Q:     And so it's your testimony that you looked at the impact that the weighing would have on the ultimate value in determining how to weight. Correct?
>
> A:     Yes. I do that not only here but in other areas.

Maher Deposition (Joint Exhibit 17 at [154]) 88:18 - 89:1. However, Ghobrial's characterization of Maher's statements is inaccurate given the full context in which they occurred. Maher was responding to questions about what "areas do you look at to determine the result when you weight a factor?" *Id.* at 89:9-10. The effect of weighting was just one of several factors Maher testified that he looked at and that, ultimately, the proper weighting to apply was "a judgment call." *Id.* at 88:7.

Nowhere in the exchange does Maher admit that the valuation he calculated had been predetermined by Ciorba, or that he had manipulated his calculations in order to reach the predetermined valuation. To the contrary, Maher explicitly denied engaging in any manipulation:

> Q:     Did you choose a result that you wanted to obtain and then decide the ratios and trends needed to get that result?
>
> A:     Oh, no. No. The process works by putting the financial data into the model, reviewing the trends, reviewing the strengths and weaknesses of the company and making your judgment call as of that particular period of time, what you think a company can generate in earnings and cash flow, and base that solely on your review. So I don't back—I think what you are saying—are you saying that I

would pick a figure and then back into it, and the answer would be, no, the valuation or the analysis comes first.

*Id.* at 118:9-19. Accordingly, Ghobrial's assertion that Maher's valuation was predetermined is unsupported.

As for her assertions that Maher's calculations were erroneous, the court need not delve into the calculations themselves because, under the terms of the 1997 Plan, Heimsoth was entitled to rely on Maher's valuation as long as it was "made in good faith." As discussed above, under the criteria set forth in the 1997 Plan, Maher's valuation was "deemed to be a good faith determination of value," and therefore Heimsoth was entitled to rely upon it in setting the value of Ghobrial's shares.

Nevertheless, Ghobrial argues that Heimsoth was not entitled to rely on the valuation—even if Maher had performed it in good faith—because Heimsoth was obligated to exercise his own discretion in determining whether to rely on the valuation. In support she cites *Armstrong v. LaSalle Bank Nat'l Assn.*, 446 F.3d 728 (7th Cir. 2006), in which the Seventh Circuit concluded that decisions made by an ESOP trustee are subject to abuse of discretion review. However, *Armstrong* did not involve an ESOP that explicitly entitled its trustee to rely on a valuation made in good faith, or at least the decision never mentioned such a provision. *Id.* at 732-34. Nor has Ghobrial explained how such a review would require the court to scrutinize Maher's calculations given the extremely deferential review that an abuse of discretion standard involves. Accordingly, *Armstrong* is inapposite.

Heimsoth is therefore entitled to summary judgment on his unjust enrichment claim and his motion for judgment on Count I is granted, while Ghobrial's motion for judgment on Count I is denied.

## B.    Denial of Diversification Rights (Second Amended Counterclaim Count I)

In her counterclaim, Ghobrial contends that an amendment to the ESOP had the effect of reducing her accrued benefits and, therefore, was invalid. Specifically, she contends that provisions that allow employees to diversify their ESOP account after reaching age 55 and participating in the plan for 10 years were more favorable in the 1989 Plan than in the plan that superseded it, the 1997 Plan. The pertinent provision of the 1989 Plan reads as follows:

Each Qualified Participant shall be permitted to direct the Plan as to the investment of twenty-five percent (25%) of the value of the Participant's Company Stock Account which was acquired by the Plan after December 31, 1986.

1989 Plan (Joint Exhibit 1 [154]) at § 14.7(a). The 1989 Plan also provided that no:

amendment shall divest a Participant of any amount to which he is already entitled, or otherwise serve to reduce, either directly or indirectly, the Participant's Accrued Benefit.

*Id.* at § 15.1. On February 14, 2002, the 1989 Plan was amended in its entirety by the 1997 Plan. The diversification provision in the 1989 Plan was amended by the 1997 Plan to read as follows:

Each "Qualified Participant" may elect within ninety (90) days after the close of each Plan Year during the "Qualified Election Period" to direct the Trustee in writing as to the distribution in cash and/or Company Stock of 25 percent of the total number of shares of Company Stock acquired by or contributed to the Plan after December 31, 1986 that have ever been allocated to such "Qualified Participant's" Company Stock Account . . .

1997 Plan (Joint Exhibit 2 [154]) at § 4.6.

Ghobrial contends that the 1997 Plan is less favorable because under the 1989 Plan, she was entitled to diversify 25% of *the amount that her account had increased in value* since December 31, 1986, as compared to the 1997 Plan, under which she was limited to diversifying 25% of *the shares in her account that the Plan had acquired* since December 31, 1986. It is undisputed that her account had increased in value by $108,673 between December 31, 1986, and when she first became eligible to diversify in 2002, whereas the shares in her account that the Plan had acquired since December 31, 1986, had a value of only $2,802. Because she believes that the 1989 Plan entitled her to diversify $108,673, while the 1997 Plan entitled her to diversify only $2,802, Ghobrial contends that the 1997 Plan reduced her accrued benefit in violation of § 15.1 (a) of the 1989 Plan.

In short, Ghobrial contends that the 1997 Plan eliminated an accrued benefit because it "only gave Ghobrial diversification rights with respect to stock acquired by the ESOP after 1986." Ghobrial Memorandum [157] at 6. Yet the 1989 Plan gave no more rights than the 1997 Plan because it, too, limited diversification rights to 25% of the "value of the Participant's Company Stock Account which was *acquired by the Plan* after December 31, 1986." 1989 Plan (Joint Exhibit 2 [154]) at ¶ 14.7(a) (emphasis added). Ghobrial's interpretation of the 1989 Plan entitling her to diversify the full increased value of her account fails to account for the phrase in the 1989 Plan that limits her diversification rights to the "value of the Participant's Company Stock Account that was *acquired by the Plan* after December 31, 1986." *Id.* (emphasis added).

Alternatively, Ghobrial argues that shares of Ciorba stock that were returned to the pool of shares owned by the ESOP upon the resignation or termination of plan participants are stock acquired by the ESOP, and therefore she was entitled to diversify any of those shares that were reallocated into her account. *See* Ghobrial Response [151] at 13 ("Ciorba never gave Ghobrial diversification rights with respect to the post 1986 allocations to her account if those allocations were used to buy stock from another participant in the plan who was being paid out.") However, Ghobrial cites to nothing within the Plans themselves or to any provision of ERISA to support

her contention that a share owned at all times by the ESOP is "acquired by the Plan" when it is merely reallocated from one participant's account into another's.

Because Ghobrial's interpretation of her diversification rights is at odds with the plain language of the 1989 Plan and is unsupported by authority, her motion for summary judgment on Count I of her counterclaim is denied, while Heimsoth and Ciorba's motion for summary judgment on that count is granted.

### C.    Breach of Fiduciary Duty  (Second Amended Counterclaim Count II)

Ghobrial also alleges in her counterclaim that Heimsoth violated his fiduciary duties by scheming to prevent his involuntary ouster as trustee of the ESOP.  Specifically, Ghobrial alleges that on October 19, 2005, Heimsoth voted the 5.7% of shares of Ciorba he owned personally, as well as the 89% of shares he controlled as trustee of the ESOP, to reduce the size of Ciorba's board of directors from three to two persons, retaining himself and one other director, and permanently removing the third director.  Ghobrial contends that the reason for reducing the size of Ciorba's board of directors was that Heimsoth could be removed as trustee of the ESOP only by a majority vote of the board of directors and, since he constituted 50% of the board, he could never be involuntarily removed as trustee.

The court need not address Heimsoth's conduct because Ghobrial lacks standing to bring the fiduciary duty claim.  Under ERISA, only plan participants have standing to sue, and a former employee has standing as a participant only if she has an outstanding claim to vested benefits. *See Kamler v. H/N Telecommunications Srvs., Inc.*, 305 F.3d 672, 678 (7th Cir. 2002) (former employee has standing under ERISA only if he has a colorable claim to vested benefits); *Crawford v. Lamantia*, 34 F.3d 28, 33 (1st Cir. 1994) (a former employee must establish standing by showing that "the defendant's alleged breach of fiduciary duty has a direct and inevitable effect on [the former employee's] benefits").  Heimsoth's alleged conduct occurred long after Ghobrial left Ciorba and received her distribution which, as discussed above, exceeded the amount to which she was entitled.  Accordingly, at the time of his conduct she had no remaining claim to benefits and, therefore she lacks standing to assert a claim based upon the alleged conduct.

Accordingly, Heimsoth is entitled to summary judgment on Count II of Ghobrial's counterclaim.

**CONCLUSION**

For the reasons stated, defendant Isis Ghobrial's motion for summary judgment [140-1] is denied, while the motion for summary judgment brought by plaintiff Gerald Heimsoth and counter-defendant Ciorba Group, Inc. [143-1] is granted. Defendant Ghobrial is ordered to pay damages to Heimsoth in the amount of $19,306.72

ENTER:

DATE: January 14, 2010

Blanche M. Manning
Blanche M. Manning
United States District Judge